COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS CIVIL ACTION NO. 16-1902A

JUAN R. RIVERA )

Plaintiff )

v. )
CITY OF WORCESTER, TERRENCE CAHILL )
CARL SUPERNOR, STEVE ROCHE )
OFFICERS DOE 1-3 )

Defendants )




DEC 16 2016

ATTEST: CLERK



**PLAINTIFFS' COMPLAINT AND REQUEST FOR JURY TRIAL**

**INTRODUCTION**

This is a civil rights action brought by Juan R. Rivera ("Mr. Rivera") against Worcester police Officers Terrence Cahill ("Officer Cahill"), his supervisor Sgt. Carl Supernor ("Sgt. Supernor"), Sgt. Steve Roche supervising officer and three other officers including a police supervisor ("Officers Doe 1-3") for the use of unreasonable force during the arrest, causing an injury to his face and head during a police raid in an apartment. Officers Cahill, and his supervisor, Sgt. Supernor both used far more force than necessary. Because this was gang unit raid, Sgt. Roche had overall command and control of the operation. After handcuffing him and others present in the apartment, Mr. Rivera and others present were also stripped searched and some beaten. A Commonwealth of Massachusetts District Court Judge dismissed the charges to deter the police from doing what they did.

## JURISDICTION

1. This action is brought pursuant to M.G.L. c. 258 and pursuant to state common law claims as well as under federal law 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

## PARTIES

2. Plaintiff Juan R. Rivera ("Mr. Rivera") is and was at all pertinent times, a resident of Worcester, Massachusetts.

3. Defendant Officer Cahill was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in Worcester County, Massachusetts. His actions in this complaint were taken under the color of law. He is sued in his individual capacity.

4. Defendant Officer Sgt. Roche as at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in Worcester County, Massachusetts. His actions in this complaint were taken under the color of law. He is sued in his individual capacity.

5. Defendant Officer Sgt. Supernor as at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in Worcester County, Massachusetts. His actions in this complaint were taken under the color of law. He is sued in his individual capacity.

6. Defendant Officer Doe 1 was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in Worcester County, Massachusetts. His actions in this complaint were taken under the color of law. He is sued in his individual capacity.

7. Defendants Officer Doe 2-3 were at all pertinent times a duly appointed and sworn Worcester police officer, and reside in Worcester County, Massachusetts and his actions in this complaint were taken under the color of law. They are sued in their individual capacity.

8. Defendant City of Worcester ("The City") is a duly organized city in the Commonwealth.

**FACTS**

9. On December 18, 2013 a group of officers from the City's narcotics and gang unit obtained a search warrant to search the apartment of Mr. Hardy located at 3 Hacker Court in Worcester.

10. Approximately ten officers from these units participated in the execution of the search warrant including two supervisors.

11. Present at the raid were Sgt. Supernor, as well as Officers O'Rourke, Cahill, Bonzcek, Guittar, Morrisey, Sgt. Roche, and Officers Gaffney, Gaffney, Batista and Garcia.

12. Sgt. Roche was the gang unit supervisor on scene and was the overall supervisor in command of the searches, seizures, arrests and strip searches on 3 Hacker Court.

13. Just before the raid Mr. Hardy had a group of friends that gathered in the Hacker Court apartment to help him move from that apartment.

14. Police officers broke the front door to the apartment without announcing themselves.

15. When police broke the door and entered the apartment, Mr. Rivera and his friends thought they were being robbed.

16. Mr. Rivera moved towards the kitchen and was told not to move and to get down on the floor.

17. Mr. Rivera froze and got punched in the face by Officer Cahill.

18. Officer Cahill's blow knocked Mr. Rivera to the ground.

19. Officer Cahill got on top of Mr. Rivera and continued to hit him in the face, nose, forehead and mouth.

20. Officer Cahill asked Mr. Rivera "what did you throw?"

21. Another officer joined as well and hit Mr. Rivera.

22. Mr. Rivera was hit with elbows and knees.

23. Another officer put his knee on Mr. Rivera's genitals.

24. Mr. Rivera was then placed on his belly while a taller officer put his hands on his groin area and said "What's this?"

25. Upon information and belief, Cahill was joined and helped by Sgt. Supernor.

26. Sgt. Supernor was Officer Cahill's immediate supervisor.

27. When Mr. Rivera asked the officers why they had beat him they told him he should not have been selling drugs.

28. At no time did Mr. Rivera, by word, act or gesture or any combination thereof, present a reasonably perceptible threat or harm to Officer Cahill or to any other person.

29. After Mr. Rivera was beaten he was handcuffed and brought into the living room area along with other males who were in the apartment.

30. There were five other males in the apartment besides Mr. Rivera.

31. That's when police officers decided to strip search some of the individuals present in the apartment.

32. The individuals that were strip searched were brought into a bedroom one by one.

33. Mr. Rivera heard what happened to two of his friends who were searched inside of the room.

34. Mr. Rivera heard police say to one of his friends "You like to run?"

35. After police strip searched that individual he returned to the living room in handcuffs and appeared to be beaten by police and said so when he returned to the living room.

36. Mr. Rivera was stripped searched as well.

37. When he entered the room to be searched, Mr. Rivera realized he was bleeding and told the officers he could not believe what they did to him.

38. They responded: "Keep selling drugs."

39. Mr. Rivera was forced to drop his pants, show his genitals and his rectum by spreading his butt cheeks.

40. At first, Mr. Rivera was hesitant but was told if he refused he would get hit again.

41. The foregoing was not reported by any of the officers who strip search Mr. Rivera.

42. Rather the officers involved gave a very different account of what happened and the manner in which they conducted their strip search.

43. In the aftermath of the raid, police taunted some of the individuals inside of the apartment.

44. The police mocked some of the arrestees with racially derogatory language.

45. One of Mr. Hardy's guest's was hit in the face by officers.

46. But the name of that guest did not appear anywhere in the arrest report.

47. A police report prepared by Officer Batista stated "All of the four males were subsequently stripped search one by one. As a result Mr. Rivera was found to be in possession of a large clear plastic bag containing seven zip lock bags and four sandwich bags containing a green leafy substance."

48. Officer Batista did not mention in his reports the unnamed guest was also stripped searched.

49. At the time of this complaint the City had a policy or a custom and practice of tolerating officers who used excessive force during drug raids and of tolerating the use of force during subsequent strip searches that followed these raids.

50. And there was also a policy and custom of tolerating and conducting strip searches that violated the City's policy that governed them.

51. These actions demonstrate the existence of a code of silence within this group of officers and within the City's police department.

52. The strip search of Mr. Rivera and others violated the strip search policies and procedures of the City and his constitutional rights.

53. Upon information and belief no strip search reports were ever generated or reviewed by the City's chief of police as required by police regulation.

54. One of the occupants stated police officers confiscated more money from him than what they actually reported in his arrest report.

55. The City has knowledge of this allegation but have never made efforts to investigate this matter.

56. The force that Officer Cahill, Supernor and Doe used was designed to cause Mr. Rivera to suffer pain, humiliation, degradation and a high probability of injury.

57. No reasonable officer would have manhandled Mr. Rivera in the manner he was and doing so served no legitimate purpose.

58. No reasonable supervisor would have ordered, allowed or countenanced force to be used to conduct strip searches against any of the occupants.

59. No reasonable supervisor would have allowed the use of derogatory language during this raid.

60. No reasonable officer or supervisor would have stripped searched Mr. Rivera in the manner he was and doing so served no legitimate purpose.

61. Even though the City's police policies required Officer Cahill to prepare an incident report detailing the force he used he did not prepare a report.

62. Even though the City had two police supervisor who supervised this drug raid and knew reports had to be prepared outlining that force they used against the unlisted occupant they ignored documenting the force used and their reporting requirements.

63. This is common custom and practice in the police department.

64. When brought to the police station Mr. Rivera was visibly injured and initially told the booking officer his injuries occurred during his arrest.

65. But when the booking officer insisted in finding out what happened to him, Mr. Rivera, became concerned something else could happen to him and refused to give police officers any additional information of what the police had done to him.

66. He insisted he simply wanted to be processed and bailed.

67. Mr. Rivera who had visible injuries at the time of his booking was transported from the police station to the hospital by ambulance.

68. Mr. Rivera had a 3 x 3 cm hematoma. He told ambulance drivers he had been hit with fists three times in the head.

69. At the hospital doctors diagnosed Mr. Rivera with head and forehead contusions as well as a nasal injury.

70. In December 2014, Mr. Rivera's lawyer filed a motion to suppress which was heard by Judge D'Angelo in the Worcester District Court. The other individuals that were arrested at 3 Hacker Court also filed similar motions.

71. On December 22, 2014 Judge D'Angelo granted the motion to suppress in favor of Mr. Rivera and others, stating "Since the police would not have lawfully been present in 3

Hacker Court, aside from the search warrant, all evidence derived from the entire search of 3 Hacker Court on December 13, 2013 is suppressed."

72. Judge D'Angelo opined "In this case, based on the violations of the entire affidavit, along with the hope that this decision will deter such violations in the future, the Court finds suppression is necessary."

73. Despite his ruling no one in the City investigated or disciplined any of the officers involved.

74. At the time of this incident the City of Worcester had a policy or custom of indifference to misconduct by Worcester police officers by failing to properly investigate complaints of misconduct and to discipline officers who used unreasonable or excessive force.

75. The City of Worcester also had a policy or custom of tolerating a "code of silence" in which its officer understood that they were not to report misconduct by fellow officers.

76. The City of Worcester developed a custom and practice of making it difficult for citizens to file complaints about the conduct of its officers.

77. Once complaints of unreasonable force are filed, the Worcester police department allowed a custom to develop among its officers of failing to properly investigate these claims and failing to discipline officers who used unreasonable force.

78. The Worcester police department also failed to monitor officer's use of force by ensuring that officers filed reports whenever someone taken into custody had a visible injury.

79. These reports are required by law and by the City's police department policies.

80. Worcester police officers routinely submit false, or incomplete forms that do not report prisoners' injuries or the actual circumstances that led to the use of force.

81. The City condoned this widespread violation of Massachusetts law as well as WPD's

own internal policies.

82. Because officers knew that they could get away with not reporting the actual force they used or the injuries they caused or the circumstances in which they occurred, officers felt free to use excessive force that caused injuries.

83. The policies and customs of the City of Worcester led the defendants' in this case including, Officer Cahill, Sgt. Supernor, Sgt. Roche and others to think or believe they could not be sanctioned for violating the rights of citizens by using unreasonable force, making arrests without probable cause, filing false reports and even testifying falsely in court and in other proceeding without sanction by the City.

84. All of these policies and procedures were the moving force behind the Defendants' violations of Mr. Rivera's civil rights.

**COUNT I**

**42 U.S.C. § 1983: Unreasonable Force-Officer Cahill, Sgt. Supernor and Does' 1-3.**

85. Each of the foregoing paragraphs is incorporated by reference.

86. Defendants' arrested Mr. Rivera without probable cause.

87. Defendants' used unreasonable force in arresting Mr. Rivera.

88. These actions deprived Mr. Rivera of well-established rights under the United States Constitution including freedom from arrest without probable cause, and freedom from the use of unreasonable force under the Fourth Amendment to the United States Constitution.

89. As a direct and proximate result of the foregoing, Mr. Rivera suffered the injuries described above.

## COUNT II

Massachusetts Civil Rights Act, M.G.L. c. 112 § 11IM
Defendants' Cahill, Supernor, Sgt. Roche, and Does' 1-3

90. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

91. Defendants' Cahill, Supernor and/or Does' 1-3 arrested Mr. Rivera to intimidate him and to serve as lesson to others.

92. Defendants' violated Mr. Rivera's civil rights under Massachusetts law by threats, intimidation and coercion.

93. As a direct and proximate result thereof, the plaintiff suffered the injuries and damages as described above.

## COUNT III

Assault and Battery
Defendants' Cahill, Supernor and Does' 1-3

94. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

95. Defendants' committed the tort of assault and battery against Mr. Rivera by assaulting and battering him without legal justification, cause, excuse, or privilege.

96. As a direct and proximate result thereof, the plaintiff suffered the injuries as described above.

## COUNT IV

Malicious Prosecution
Defendants' Cahill, Supernor, Sgt. Roche and Does' 1-3

97. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

98. Defendants' caused criminal charges to be brought against Mr. Rivera for which there was no probable cause, and with malice. The case against Mr. Rivera was dismissed by

the Court.

99. As a direct and proximate result of Defendants' actions, Mr. Rivera suffered damages.

## COUNT V

**42 U.S.C. § 1983: Monell Claims Against City of Worcester, Sgt. Roche and Sgt. Supernor**

100. Each of the foregoing paragraphs is incorporated by reference.

101. The policies and customs of the City of Worcester as described above were the moving force behind the violations of Plaintiff's constitutional rights by Defendant Cahill, Does'1 1-3.

102. The policies and customs of Sgt. Roche and Sgt. Supernor and their failure to intervene, train and discipline or supervise strip searches conducted by subordinates was the moving force behind the violations of Plaintiff's constitutional rights by Defendant Cahill, Does'1-3.

## COUNT V

**Mass. Tort Claims Act Chapter 258**
**City of Worcester**

103. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

104. On December 14, 2015, Mr. Rivera's counsel served the City of Worcester with a letter of Notice and Presentment under the Massachusetts Tort Claims Act.

105. The letter appraised the City of Mr. Rivera's allegations and the injuries he sustained as a result of the conduct of its employees.

106. Mr. Rivera satisfied all conditions precedent to file this negligence action under Chapter 258 § 4.

107. As a direct and proximate result of the negligent conduct of the City's employees, plaintiff was harmed as stated herein.

Wherefore, Plaintiff hereby respectfully requests the following relief:

1. All compensatory damages;
2. All punitive damages against Cahill, Roche, Supernor and Does' 1-3;
3. Award costs of this action, including reasonable attorney's fees and
4. Award such other relief as the Court deems just and proper;

**JURY DEMAND**

Respectfully submitted,
Plaintiff JUAN R. RIVERA
By his attorneys,

Keith T. Higgins, BBO# 630249
Pawlak & Higgins, LLC
61 Academy Street
Fitchburg, MA 01420
Tel. (978) 3415-5132
keith@pawlaklegal.com

Dated: December 15, 2016

A true copy by photostatic process
Attest:
Asst. Clerk